24-644, Carol v. Trump Thank you. All right, counsel, I see you've reserved three minutes for rebuttal. Yes, Your Honor. All right. When you're ready, you may proceed. May it please the Court, Justin Smith, on behalf of President Donald J. Trump, the decision below severely damages the presidency and is a great miscarriage of justice. President Trump has consistently maintained that these are false accusations by a woman he never met. His initial denials are the statements at issue in this case. It is undisputed that the statements came from the White House, that they were in response to reporter inquiries by a matter of public interest, and that they were distributed through White House channels by the White House press office. Despite this objective proof of official action, President Trump was denied the protection of presidential immunity. He was prevented from putting on critical evidence and from presenting the appropriate jury instruction. So why wasn't the immunity waived, and didn't we already saw hope? Judge Chen, the immunity was not waived because, as President Trump has maintained throughout this case, the immunity is not waivable. And the court in the United States v. Helskovsky said the Supreme Court expressed doubt that this type of immunity, rooted in the separation of powers, is even waivable. But second, because of Trump v. United States, that's an intervening decision that this panel didn't have the benefit of when it rendered its last decision on this issue. And the Trump v. United States found that this immunity for the president is on the same footing as the speech or debate immunity that legislators enjoy in Congress. Does the Supreme Court's case talk about waivability at all, or whether it's a jurisdictional defense? Judge Chen, if you're talking about the Trump v. United States case, waiver was not addressed in that case because it didn't need to be. In that case, as in this one, the president had maintained throughout that he had presidential immunity. In the United States v. Helskovsky case, the facts of that case, I think, are very important for this Court to look at because Congressman Helskovsky appeared before a grand jury eight times over the course of two years before he asserted speech or debate immunity for the first time. So, are you suggesting that this Court has already ruled against your position on that, that presidential immunity is waivable? And that decision was by a panel of this Court, with a couple of us on that panel. That wasn't appealed, correct? Your Honor, the decision at that time did not need to be appealed, and it is appropriate to bring it at this time. And the reason that the issue was not decided in that case, I direct the Court to footnote one of the opinion, Judge Cahn, that you joined a few years ago. In that footnote, the Court used waiver and forfeiture interchangeably and said that the difference didn't matter. It does matter after Trump v. United States because the immunity is now firmly rooted in the separation of powers. And in footnote one of the last opinion, the Court clearly said that it was not making any finding on whether it was an intentional relinquishment of immunity. And that is now the appropriate standard, which the Court has not ruled on. Can you help explain, help me understand why you wouldn't have raised that issue two years ago when the Supreme Court has said that presidential immunity is something that should be decided at the earliest juncture in litigation? Why wait two years, not appeal that decision if this panel got it wrong, and wait until after a trial to raise it? So first, Your Honor, we dispute that factual procedural record because in the third affirmative defense in the original answer, President Trump raised that one of his affirmative defenses was an immunity under the Constitution. And throughout the litigation, there's been a consistent assertion of presidential immunity. When this panel's opinion came down in December of 2023, that was around the same time that the Supreme Court was taking Trump v. United States in which that question of immunity would be decided. And it was appropriate for the President to litigate in that case and obtain the important decision that applies in this case now about presidential immunity. But that decision did not deal with waiver, correct? Whether presidential immunity is waivable? It dealt with the fact that presidential immunity is now on par with the speech or debate clause. Before then, this panel compared presidential immunity to the absolute immunity enjoyed by prosecutors and judges, which is waivable. Let me ask you then a different question, and this will be, I don't want to take up time from your argument or from questions my fellow judges may have. But at the two years ago, you were, well, your co-counsel was asked or then counsel arguing that if, in fact, we disagreed that presidential immunity was waivable, capable of being waived, whether or not, in fact, it was waived in this case. And counsel then conceded that if it is capable of being waivable, then it was waived. Why should that change now? Because you seem to be arguing now that's not the case, so. Yeah. It should be, the answer is different for a couple of reasons. And I think the transcript you're referencing is in footnote 51 or 52 of the last opinion. And returning again to footnote one, the Court said that the parties in the Court in the last case were using waiver in place of the word forfeiture, that the parties just said waiver as applicable to both. But it was clear that the last time the questions and the arguments related to a forfeiture argument. And under the United States versus Helstosky decision, which now applies because of Trump versus the United States, the ordinary rules for waiver no longer apply. That's in the clear quote from the United States versus Helstosky case. And so any argument last time about forfeiture no longer applies because you have to have an express and unequivocal renunciation. That's a standard in Helstosky. It's consistent with the standard for sovereign immunity under the Edelman versus Jordan case that we cite and the Nordic Village case, which also require express and unequivocal language. And there's been no assertion and no finding that President Trump unequivocally and explicitly renounced his immunity in this case. And that's why the last decision should not apply here. There's been an intervening decision by the United States Supreme Court on this same issue. And that decision by the Supreme Court cast doubt on this panel's decision from last time. And it results in the need for a different decision in this case. As the court in the Kanjemi case that we cite in our brief said, the appellate review's function is to correct errors, not to perpetuate them. And because the Supreme Court has an intervening decision that cast doubt under the Sullivan case by this court in 2005, the panel's decision no longer applies and the judgment will be reversed on the basis of presidential immunity. I see my time expired. Let me ask you a quick question before you sit down, sort of a logistical question. It doesn't look to me like you're appealing the dismissal of the counterclaim. Is that right? That's correct, Your Honor. Okay, thank you. Good morning, Your Honors. May it please the court. Roberta Kaplan for plaintiff, appellee E. Jean Carroll, who is sitting behind me in the courtroom today. In Trump versus United States, the decision that my friend on the other side was just talking about, the Supreme Court reiterated a fundamental principle of our democracy. The president is not above the law. President Trump himself acknowledged that same principle at the very beginning of this case when he represented to the state court judge who was then presiding that E. Jean Carroll could pursue this action later, quote, when the president is no longer in office. It's been a very long and winding road since then, Your Honors. While we're not quite in bleak house territory, we are getting closer. It's now been more than five years since E. Jean Carroll first brought this case. But despite the press and despite the fact that it involves President Trump, we submit this is actually a very straightforward appeal. Why? Because as Judge Chin already mentioned, this court has already held in a 35-page opinion by Judge Cabranes on interlocutory appeal that presidential immunity can be waived and that Trump waived it here. That's the law of the case. It controls the outcome. So why? How do you respond to the argument that Trump versus United States is an intervening decision that changes things? It would be an intervening decision, Judge Chin, only if it spoke to the question of waiver and it doesn't use the word waiver. It doesn't speak of the concept of waiver. All the other principles in Trump versus United States are the same principles this court talked about, actually, in its interlocutory decision, including the importance of the president in respect of the separation of powers to be able to decide on his own whether to waive presidential immunity or not. And it talked about the case against John F. Kennedy where John F. Kennedy decided to go forward. How do you address the argument now that when the representation was made to this court that if presidential immunity was capable of being waived, in fact, there was a concession that it was waived in this case? Now the claim is that we got it wrong and the argument was on forfeiture and not forfeited rather than waived. I was here that day, Judge. I didn't argue, but I was here that day. And I heard Ms. Hava say exactly what you said. She said, if presidential immunity is waivable, then it was waived here. That's a concession. It's the way she's bound by that. And she didn't say at that time, well, I met waiver, but I don't need forfeiture. If she wanted to make that kind of a, I think, meaningless, as this court has pointed out in its decision distinction, she should have said it then. And I'll point out that in the recent en banc decision in the other case, Judge Chin and Judge Carney actually made this point when they quoted Justice Scalia's concurrence in Castro and said that our adversary system is designed around the premise that the parties know what is best for them and are responsible for advancing the facts and the arguments and titling them to relief. That's what happened here. That's what Ms. Hava did. They are bound by it. With respect to the other arguments President Trump makes, we think that they were all properly decided by Judge Kaplan below and they're not. There's one issue I'd like you to address, collateral estoppel as to actual malice. Yes. In other words, the jury in Trump and Carroll too found actual malice as to 2022 comments. Why should that be collateral estoppel as to comments made three years earlier as to the issue of actual malice? So two reasons, Your Honor. First of all, Judge Kaplan held that on summary judgment. The reason he held it on the summary judgment is because if President Trump wanted to say that his state of mind was somehow different in 2019 than it was in 2022, then he had a burden to come and say that. And he never made that argument. And again, quoting you, Judge Chin, in your recent statement in connection with the en banc denial, you made this point yourself. You said that Trump's principal defense was that the alleged assault simply did not happen, that his statements about Carroll were true. An actual malice defense, that a false statement was uttered without actual malice, was thus orthogonal to the basic position. I'm going to turn, Your Honors, to Hostoski because there was a lot of discussion by my friend on the other side about Hostoski. So the first point I want to make about Hostoski is it was decided in 1979. The unequivocal waiver of language in Hostoski existed in 1979. Trump did not make that argument on interlocutory appeal about Hostoski and about the nature of renunciation, and therefore it's waived for the same reasons Judge Chin and Carney said in the en banc statements. But their argument, I think, right, is that the decision, the recent Trump decision from the Supreme Court informs our now understanding of Hostoski's holding, right? I think that's their argument, that Hostoski did say that if there is such a thing as waiver for some of these speech and debate, for some of these immunities, it would have to be affirmatively and unmistakably made. Okay. So let me turn to that. Let me talk about Hostoski and say why this case is different. Hostoski was a case about a New Jersey congressman who was indicted for corruption, who was called to give testimony and documents to a grand jury. It's not clear to me whether it was eight times or nine times, but it was a lot of times. For the most part, he cooperated. On one of the last sessions of either the 8th or the 9th, he asserted immunity under the speech and debate clause for the first time. The DOJ, as you would expect, argued that by voluntary providing the documents and the testimony earlier, he had waived immunity. Supreme Court disagreed. This situation here is very different from the Hostoski. Here at the very beginning of this case, the timing here is crucial. Donald Trump moved to state proceedings in the state court, promising the court and the parties that, quote, no one is seeking to escape accountability here and that Carroll could, quote, pursue this action when the president is no longer in office. If that doesn't mean explicitly and unequivocally that Trump would not be asserting absolute immunity later in the case, then I'm not sure what it was intended to convey. In fact, although Trump contends the letter is only about a different kind of immunity, at page two of the letter, Donald Trump's lawyer at the time writes as follows. Plaintiff grossly mischaracterizes the Supreme Court presidential immunity cases. What does he cite? He cites United States versus Nixon. On top of that, your honors, as was already discussed, Trump never raised presidential immunity in his answer, also filed in February 2020 at the very beginning of the case. He didn't raise it until three years into the case on summary judgment after discovery had already ended. And even then, for the first time in his reply brief, in civil litigation, as opposed to in the grand jury proceedings, that is how parties waive affirmative defenses, by not raising them, as Judge Kaplan in this court has already held. I'd like to talk about damages for a minute, which I know is skipping over a whole bunch of things in between immunity and damages. But so we have a $7 million, give or take, compensatory award here. And that separates out this reputation restoration program. Can you articulate for me what is that compensating for? Because I think the argument is it's not limited to emotional distress. There's more to this. Can you talk about that for a minute? So it compensated Ms. Carroll for the following things. One, the loss of her career at Elle Magazine, where she had been one of the nation's leading and longest-serving advice columnists for decades, and other tangible economic harms she testified to, like complete absence of any freelance writing jobs after this happened, after Mr. Trump said what he said. Two, the continuing injury that Carroll suffered and continues to suffer, including from the horrific rape and death threats she continues to receive almost every day. I think I put at least 50 of those into evidence at the trial. And without getting into detail, they are truly graphic and horrifying. They threaten her with rape and with killing by possibly every means known to man, by gun, by strangling, by disemboweling. You can only imagine. And the jury was entitled to find that those threats are sufficiently connected to President Trump's statements that they could be part of the damages in this defamation. Correct, Your Honor. They definitely weren't part of the reputational repair campaign. And three, there's some graphic testimony about what she has to do to make sure she's physically protected. She told a story about going to the grocery store one day where she lives and seeing a car kind of following her and having a bit of a panic attack and going back into the grocery store and waiting until that car left before she went home. She lives in a world, as she said, that is incomprehensible to most of us, where every day she has to worry whether someone spurred on by those original statements of 2019 is going to try to do her harm. I have just a question of clarification before your time runs up. And this relates to a question asked by Judge Chen. In terms of the argument on the preclusive effect of actual malice, is it, I understand your position to be, and correct me if I'm wrong, that the district court got it correct in terms of the collateral effect of actual malice? But if not, then the district court correctly decided the summary judgment motion on actual malice? Correct, Your Honor. And that was not appealed to us, correct? The court's decision on actual malice has not been appealed? My brilliant colleagues to the right just nodded, so that is correct, Your Honor. Okay, thank you. I'm going to touch on punitive damages just for a second in the very little time I have left. The punitive damages award here was high. The standard is 3.6 to 1, and that's high punitive damages. But so was the situation. Judge Kaplan said in his decision, and he was correct, that this provided an exceptional circumstance where President Trump, who showed up at this trial, showed his hatred and disdain for Ms. Carroll every single day in that courtroom. He also showed his disdain for the judicial process. He refused to follow the judge's orders. He constantly referred on True Social Posted about evidence that Judge Kaplan had ruled inadmissible. He continued to defame Ms. Carroll throughout the trial, press conferences that he held after trial was concluded. That kind of record, which I don't think there's a record like that in any case anywhere, certainly justified the punitive damages award. I said to the jury, award, but deterrence is clearly a legitimate purpose of punitive damages, and I said to the jury at my closing, which by the way, Donald Trump got up and walked out of after 10 minutes, but I said to them, awarding punitive damages what it will take to make him stop. They knew he hadn't stopped even since the first trial. So I don't think there could be any question about punitive damages, Your Honor, and I'm over. I apologize. Thank you, counsel. All right, Mr. Smith, you've reserved three minutes for rebuttal. Thank you, Judge Miriam. In response to my friend on the other side's argument, I'd like to begin with the Helstosky decision. The other side's argument, again, boils down to a forfeiture argument, the fact that it wasn't raised soon enough. You heard the comment made that Helstosky was around since 1979, and this citation wasn't until too late in the litigation. That is not enough under the Helstosky decision for explicit and unequivocal renunciation of the waiver. And if you look at the Edelman v. Jordan case on the Eleventh Amendment immunity and the United States v. Nordic Village case on federal sovereign immunity, in both those cases, sovereign immunity wasn't raised until appeal, and that was permitted by the Supreme Court in both of those cases. And again, here we would contend that presidential immunity was raised at the outside of this case in the original answer, affirmative defense number three, paragraph 149 of the original answer, where President Trump asserted an immunity defense under the Constitution of the United States, which is what presidential immunity now is. How do you respond to the argument with respect to punitive damages, that the circumstances here were exceptional and extraordinary? So under the Turley case, which involved racist harassment and death threats, the court in that case, which had a 3.8 to 1 ratio, said that that was too high. It was unreasonable. And it said in most cases where compensatory damages are incapable of precise estimation, the appropriate ratio will be 1 to 1. And here we have a case where, again, compensatory damages are incapable of any precision. And so the appropriate standard is 1 to 1, just like this court said in the Turley case. In the Turley case, they ended up upholding a 2 to 1 ratio, given the extreme circumstances in that case. But that case, again, involved far more egregious conduct than any allegations in this case. And 2 to 1 was the maximum allowed there. As to compensatory damages, the jury instructions narrowed the relief available to humiliation and mental anguish. That was the jury charge in the instructions. Any testimony about Elle Magazine or any of that sort would be an economic damage that's outside humiliation and mental anguish. And if you look at the Stamp case and the Duarte case, which was a district court decision, there were three categories of emotional distress damages. And this case clearly falls in the garden variety category, because there was no medical evidence and no testimony about a medical condition. And under those cases, this makes this garden variety. And this court has said that $100,000 is about where garden variety compensatory damages are in this circuit. The Judge Menasche also, when it comes to the jury verdict in this case and his dissent in the other case, he talked about how the evidence excluded makes a huge difference. We were talking with Judge Chin about the actual malice evidence and state of mind. But there was a whole host of evidence that President Trump was unable to present in this case. And the dissent a couple weeks ago in the other case very well said that the evidence excluded could lead a reasonable observer to believe that the lawsuit was fabricated to advance a political agenda, and that there could be no confidence that the jury would reach the same verdict if that evidence had been admitted. And the same is true in this case. In this case, though, I think the primary complaint on the actual malice about him being limited to what he could say isn't what he was going to say at trial reflected in his deposition, which was admitted. So I'm wondering, is that under either plain error or abusive discretion, which one or the other of those I think applies here probably, was that not harmless, given that the deposition came in and he said all of those things that presumably he would have testified to? It was not a harmless error, because this was one of the core components the jury had to find in evidence that the President intended to submit evidence on. But if it came in another way, did it not come in through the deposition testimony, his explanation of why he said those things? The deposition covers a wide range of ground. I don't believe it was ever quite so clear as what the President would have presented at trial had he been given the opportunity, and he was denied the opportunity. So is this the exclusion after the word no? Is that the primary hook here? Is it that statement that was most problematic? That was the most problematic at trial, where he said he was trying to defend himself, his family, and the presidency, both on actual malice, but that also goes to the common law malice, which under the New York law must be the sole motivating factor in order to award punitive damages. And that statement is directly tied to that standard. It was unable to be presented at trial, even though that was relevant to the jury's determination, had they been properly instructed. And so for those reasons, this Court should reverse to protect the presidency and to prevent drastic departures from its precedence. All right. Thank you both. Well argued. We appreciate your arguments.